

FILED

2005 Aug-26  AM 11:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| CATHERINE ANN MILLER, et al., | ] |
| | ] |
| Plaintiffs, | ] |
| | ] |
| vs. | ] |
| | ] |
| UNITED STATES OF AMERICA, | ] |
| | ] |
| Plaintiff-Intervenor, | ] |
| | ] CIVIL ACTION NO. CV-63-CO-574-M |
| NATIONAL EDUCATION ASSOCIATION, | ] |
| | ] |
| Plaintiff-Intervenor, | ] |
| | ] |
| vs. | ] |
| | ] |
| THE BOARD OF EDUCATION OF GADSDEN, ALABAMA, et al., | ] |
| | ] |
| Defendants. | ] |

## MEMORANDUM OF OPINION

In this long-standing desegregation case, the plaintiff, Catherine

Miller, by and through her mother and next friend, Pauline McAfee Mill,

originally filed suit in 1963 to obtain relief from race discrimination in the

operation of a *de jure* segregated school system. The defendant is the Board of Education of Gadsden, Alabama, and its members (hereinafter the "Board").  On June 10, 2005, the Board filed a motion for declaration of unitary status and dismissal of this litigation.  Based on the evidence presented, the Court concludes that the motion should be granted and this litigation dismissed.

I.    BACKGROUND

      A.    Early Litigation

This case began in 1963 when Catherine Miller, through her mother and next friend, sued the Board and its members seeking relief from the continued operation of a racially segregated school system. The United States was subsequently added as a plaintiff-intervenor.  On December 27, 1963, the district court found that the Board had violated the Constitution by operating its schools on a segregated basis.  The Court initially ordered the Board to desegregate its system using a "freedom of choice plan" but later rescinded that order and required the Board to devise and implement a plan for the assignment of students on some basis other than freedom of choice, pursuant to the Supreme Court's ruling in *Green v. County School*

*Board of New Kent County*, 391 U.S. 430 (1968).  On September 4, 1969, the Court approved the Board's plan which was later amended following motions by private plaintiffs and the United States for further relief relating to faculty and staff assignments.  On July 25, 1969, the Court entered a decree "pursuant to several recent decisions of the Fifth Circuit Court of Appeals dealing with the disestablishment of dual school systems" which required the Board to "prepare plans to disestablish the dual school systems presently maintained in the City of Gadsden, Alabama." Said decree further provided that "such plans shall be directed to (a) student and faculty assignment, (b) all facilities, (c) all athletic and other school activities, and (d) all school location and construction activities" and that the defendants "make available to the Office of Education, or its designees, all requested information leading to the operation of such school system."

Between July 25, 1969, and April 1975, the Court approved various amendments and additions to the Board's desegregation plans. On April 4, 1975, the Board submitted a comprehensive desegregation plan that was agreed to by the parties and was approved by the Court.  This desegregation plan was based on a comprehensive study of the system conducted in 1973

by the University of Tennessee.   Said plan sought to implement the University of Tennessee study which endeavored to maximize desegregation without resorting to busing of children to achieve this objective.   The plan sought to achieve this objective through shifting zone boundaries and strictly enforcing  zone attendance centers.   To implement the plan, the Board shifted its zone boundaries in accordance with the study.   These zone boundaries are still in effect today.

On October 23, 1987, the Court entered an order requiring that all parties show cause why this case should not be dismissed in the manner prescribed by the Eleventh Circuit.   On October 11, 1988, this Court stayed all action on the desegregation cases before it, pending the outcome of unitary status issues on several cases on appeal to the Eleventh Circuit.   In April 1994, the Court once again entered an order requiring that the plaintiff show cause why the system operated by the Board should not be declared unitary.

After the Court's April 1994 order to show cause, the parties jointly agreed to enter into a consent order, which was approved by the Court on May 24, 1995.   The Court subsequently amended the consent order in July

1995 (the May 1995 consent order and the July 1995 amendment thereto are collectively referred to herein as the "1995 Consent Order").   This amendment  required  the Board to implement a voluntary majority-to-minority student transfer policy (hereinafter referred to as the "M-M policy").  The 1995 Consent Order was a comprehensive plan which included each of the areas outlined in *Green v. County School Board of New Kent*, 391 U.S. 430 (stating that the indicator areas of school operation are: student assignment, faculty and staff, transportation, facilities and extracurricular activities.)  In the 1995 Consent Order, the parties also addressed what have become known as quality-education issues that more closely relate to a student's day-to-day experiences within a school. *Freeman v. Pitts*, 503 U.S. 467, 472 (1992).

During the four-year period of the 1995 Consent Order, the Board submitted the requisite annual reports that outlined its compliance therewith.  These annual reports included, among other things, boxes of documents, charts, reports and spreadsheets.

In May 1999, upon the expiration of the four-year term of the 1995 Consent Order, the Board petitioned the Court for a declaration of unitary

status.  The Court added the State Board of Education (hereinafter referred to as the "SBE") as a necessary party to this action on July 30, 1999, because the SBE had, at that time,  assumed control of Litchfield High School pursuant to Ala. Code § 16-6B-3 (1975).  After discovery and a hearing, the Court declared the system to be unitary on March 21, 2000. The plaintiff and plaintiff-intervenor appealed the Court's decision, and the Eleventh Circuit Court of appeals reversed and remanded the case for further factual findings. *Miller v. Board of Education of Gadsden, Alabama*, No. 00-1224 (August 8, 2001).

After the remand by the Eleventh Circuit, the Court ordered that the Board file a supplemental petition for unitary status and set the matter for another hearing.  However, the parties were able to enter into settlement negotiations the result of which was an agreed-upon consent decree that was approved by the Court on July 14, 2003.  This consent order included a submission by the parties of several unresolved issues to the Court for its determination.  On August 4, 2004, the Court entered an order amending section IV.A. of the Consent Order with regard to the unresolved issues.  In April 2004, the parties entered into an agreed-upon amendment to the

consent order which was subsequently approved by the Court.   This amendment provided for the consolidation of the system's high schools and the closing of Jessie Dean Smith elementary school. The new consolidated high school is currently under construction and scheduled to open by the beginning of the 2006-2007 school year.   Jessie Dean Smith elementary school was closed prior to the beginning of the  2004-2005 school year and the new consolidated high school is being constructed on this site.  (The July 14, 2003, Consent Order and the August 4, 2003, and April 2004 amendments thereto will be collectively referred to as the "2003 Consent Order.")

B.    School District Profile

The Board currently operates fourteen schools, eight elementary schools (1-5), three middle schools (6-8), and three high schools (9-12). However, as stated above, the system's three high schools will be consolidated as of the beginning of the 2006-2007 school year, and one elementary school, Jessie Dean Smith elementary school, closed during the pendency of the 2003 Consent Order.  At the beginning of the first school year following the  entry of the 2003 Consent Decree, the district enrolled approximately 5,498 students:  3,015 (54.8%) black; 2,200 (40.0%) white; and 283 other

(5.2%).  As of the beginning of the 2004-2005 school year, the district enrolled approximately 5,351 students:  2,952 (55.2%) black; 2,077 (38.8%) white; and 322 (6%) other.  A racial breakdown of each school was provided by the Board via affidavit at the public hearing.

At  the beginning of the first school year following the entry of the 2003 Consent Decree, the district employed 209.18[1] certified faculty:  39.83 (19.04%) black and 169.35 (80.96%) white.  As of the beginning of the 2004-2005 school year, the district employed 214.98 certified faculty:   45 (20.93%) black and 169.98 (79.07%) white.  At the beginning of the first school year following the entry of the 2003 Consent Decree, the district employed 84.35 non-certified staff:  24 (28.45%) black and 60.35 (71.55%) white.  As of the beginning of the 2004-2005 school year, the district employed 78.50 non-certified staff:  21 (26.75%) black and 57.50 (73.25%) white.

C.    The 2003 Consent Order

---

[1] Some faculty and staff are employed on a part time basis; therefore, the percentages are not whole numbers.

The 2003 Consent Order provided that the Board had achieved partial unitary status in many areas, subject to the factors set forth in *Green v. County School Board of New Kent*, 391 U.S. 430. The 2003 Consent Order also outlined the Board's remaining obligations regarding desegregation as follows:

> A.  The parties' expectation is that this Consent Order will lead to the termination of judicial supervision at the end of the 2004-05 school year.  This Consent Order sets forth the totality of the Board's obligations in this desegregation case.  In consideration for the Board's agreement to this Consent Order, the plaintiff-parties hereby stipulate that the school district has achieved partial unitary status in the areas of student assignment (except for the student assignment provisions set forth in Sections II and V, below); faculty and staff assignments (except for the faculty and staff assignment provisions set forth in Section III, below); transportation (except for the transportation provisions set forth in Section II, below); facilities (except for the facilities provisions set forth in Section VII, below); extra-curricular activities; and quality of education and curriculum (except for the quality of education and curriculum provisions set forth in Sections VI and X, below).  Therefore, this Court no longer retains jurisdiction over the areas not specifically set forth in this Consent Order.

The 2003 Consent Order sets forth in detail the remaining areas to be addressed and the remaining actions to be undertaken by the Board in order to achieve unitary status. In other words, the decree represented "a

roadmap to the end of judicial supervision" of the Gadsden City School System.  *NAACP v. Duval County School*, 273 F.3d 960, 963 (11th Cir. 2001).  Many of the areas addressed fall under the *Green* factors, the areas of school operation which are traditionally held as indicators of a desegregated (or not) school system.  *Green v. County School Board of New Kent*, 391 U.S. 430, 435 (stating that the indicator areas of school operation are: student assignment, faculty and staff, transportation, facilities and extracurricular activities).  The parties also addressed what have become known as quality of education issues that more closely relate to a student's day-to-day experiences within a school.  *Freeman v. Pitts*, 503 U.S. 467, 472.

The Board was required to file comprehensive reports with the Court and parties on September 15 and February 15 each year, and the plaintiff parties had the opportunity to advise the Board of any concerns about compliance with the terms of the 2003 Consent Order.  The United States submitted two responses to the Board's bi-annual reports.   The first response was to the September 15, 2003 Report, in which the United States addressed personnel assignment issues and reporting issues for time periods before the 2003 Consent Order.  The Board replied to the United States'

concerns by providing additional information and a written, narrative response.  The second response was to the Board's September 2004 Report in which the United States addressed concerns about the participation of African-American students in advanced curriculum courses.  The Board replied by providing the United States with detailed information about the Board's efforts to increase African-American student enrollment in advanced classes.  The 2003 Consent Order also provided that within thirty (30) days of the end of the 2004-05 school year, the Board could file a motion  with the Court to be declared unitary in all respects and to have this case dismissed.

D.    Motions for Declaration of Unitary Status

On June 10, 2005, the Board filed a Motion for Declaration of Unitary Status and Order of Dismissal. On June 23, 2005, the United States filed a response to the Board's Motion for Unitary Status and Order of Dismissal, stating that it had no objections based on the information provided by the Board.  On July 7, 2005, counsel for the private plaintiff filed a response to the Board's Motion for Unitary Status and Order of Dismissal, stating that it had no objections to the Board's motion at the present time, but reserved

the right to make further objections upon the conclusion of the August 24, 2005, public hearing. The Court then set the motion for a fairness hearing and required the Board to give all plaintiff class members appropriate notice of the motions and notice of the fairness hearing.  After the Court approved the notice form, the Board published, in two local newspapers (with one such newspaper's targeted readership being Gadsden's African-American community), notice of the proposed termination of this litigation and the date of the fairness hearing.  The court-ordered notice also provided procedures for the public to file written comments and objections with the Court regarding the proposed dismissal.  Forms for objections and comments were made available at the Board's central office and at each school in the district.  Moreover, the notice provided that copies of the bi-annual reports, the 1995 Consent Order, the 2003 Consent Order, and the Motion for Unitary Status were available for public review at the Board's central office.

No objections were filed to the Board's Petition for Unitary Status and Order of Dismissal.  The Court concludes that the Board complied with the directives of the Court in providing adequate notice of the proposed

dismissal to class members as well as to the community.  Fed. R. Civ. P. 23(e).

II.   DISCUSSION

A.   Standards for Termination of a School Desegregation Case

It has long been recognized that the goal of a school desegregation case is to convert promptly from a *de jure* segregated school system to a system without "white" schools or "black" schools, but just schools.  *Green v. County School Bd. of New Kent*,  391 U.S. 430, 442.  The success of this effort leads to the goal of ultimately returning control to the local school board since "local autonomy of school districts is a vital national tradition." *Freeman v. Pitts*, 503 U.S. 467, 490 (quoting *Dayton Bd. of Education v. Brinkman*, 433 U.S. 406, 410 (1977)).  Returning schools to the control of local authorities "at the earliest practicable date is essential to restore their true accountability in our governmental system." *Id*.   The ultimate inquiry concerning whether a school district operating under a school desegregation order to dismantle a *de jure* segregated school system should be declared unitary is whether the school district has complied in good faith with the desegregation decree, and whether the vestiges of prior *de jure*

segregation have been eliminated to the extent practicable. *NAACP, Jacksonville Branch v. Duval County Sch.*, 273 F.3d 960, 966 (citing *Missouri v. Jenkins*, 515 U.S. 70, 88 (1995) (quoting *Freeman v. Pitts*, 503 U.S. 467, 492). *See also Manning v. Sch. Bd. of Hillsborough County*, 244 F.3d 927, 942 (11th Cir. 2001), *cert. denied*, 534 U.S. 824 (2001); *Lockett v. Bd. of Educ. of Muscogee County*, 111 F.3d 839, 843 (11th Cir. 1997).

In addition to these articulated constitutional standards, here the Board was also required to comply with the contractual requirements of the 2003 Consent Order which set forth the steps the Board was to take to attain unitary status. *NAACP, Jacksonville Branch v. Duval County Sch.*, 273 F.3d 960.

The legal standards for dismissal of a school desegregation case are: (1) whether the district has fully and satisfactorily complied with the Court's decrees for a reasonable period of time, (2) whether the vestiges of past discrimination have been eliminated to the extent practicable, and (3) whether the district has demonstrated a good-faith commitment to the whole of the Court's decrees and to those provisions of the law and the Constitution that were the predicate for judicial intervention. *Missouri v.*

*Jenkins*, 515 U.S. 70, 87-89 (1995).  By emphasizing that the good-faith component has two parts (that is, that a school district must show not only past good-faith compliance, but a good-faith commitment to the future operation of the school system), the parties looked both to past compliance efforts and to a good-faith commitment to the future operation of the school system through "specific policies, decisions, and courses of action that extend into the future."  *Dowell v. Bd. of Educ. of the Oklahoma City Public Schools*, 8 F.3d 1501, 1513 (10th Cir. 1993) (citations omitted).

B.   Terms of the 2003 Consent Order

1.   Majority-to-Minority ("M-M") Transfer Policy

With regard to the M-M policy, the 2003 Consent Order stated as follows:

A.   The Board shall continue to ensure that majority-to-minority (and any No Child Left Behind Act (NCLBA)) transfers have priority at the schools of their choice ahead of any students from the county.

B.   The Board shall promote its majority-to-minority policy, including promoting the fact that transportation is provided by the district, by providing public service announcements to that effect, and requesting that such announcements be placed in *The Reporter* and *The Gadsden Times* at least once each month during March, April, May and

June of each year; requesting that public service an-
nouncements be aired to that effect on WMGJ radio and on
Gadsden Comcast Cablevision's local origination channel;
announcing the policy at meetings of the bi-racial advisory
committee; and providing to all teachers and mailing to
each parent or guardian, within ten (10) days of the end of
each school year, a flyer describing the majority-to-
minority policy, transportation by the district, eligibility
requirements, the deadline for submission of applications,
and the name and telephone number of knowledgeable
school district official(s) who are available to answer
questions about the policy. The Board shall designate and
train one central office administrator to serve as the
coordinator of the policy, and shall ensure that all school
principals and front office staff and central office person-
nel are informed of the procedures for m-m transfers and
of the contact information for the central office adminis-
trator who is the designated policy coordinator.

The Board allows students who reside in Etowah County, but do not

reside in the City of Gadsden to attend a school in the Board's system,

provided there is available space in the school. However, in accordance

with the 2003 Consent Order, the Board has not allowed this policy to

displace any student applying for a transfer pursuant to the M-M policy.

With regard to the promotion and advertising of the M-M policy, the

Board has met, and even exceeded, the requirements of the 2003 Consent

Order. The Board advertised the M-M policy to the media outlets required

by the 2003 Consent Order, as well as eight (8) additional media outlets not listed therein.[2] Moreover, all members of the Bi-Racial Advisory Committee were notified of the M-M policy.  All teachers, parents, principals and front office staff were notified of the M-M policy as required by the 2003 Consent Order.  The Board mailed flyers to all parents or guardians within ten days of the end of the school year; all teachers were provided with a copy of  the policy; and all  principals and front office staff were informed about the procedures for M-M transfers. The Board also announced the M-M policy at its regularly-scheduled meetings.   The Board also designated Sandra Graham, Director of Student Services, to serve as coordinator for the M-M policy and all staff were provided with Ms. Graham's contact information should they have any questions about the M-M policy.

The Board documented its compliance actions and included said documentation in its bi-annual reports to the Court and parties.  During the pendency of the 2003 Consent Order, no party lodged any complaint (using

---

[2] The additional media outlets were <u>The Messenger Newspaper</u> and the following radio stations: WSGN; WGAD; WAAX; WQSB; WAAY; WKXX; and WJBY.

the procedure outlined in the 2003 Consent Order or otherwise) that the

Board had not complied with the M-M policy requirements.

    2.     Personnel Assignment

The Board's obligations regarding personnel assignment were two-fold.

The first requirement dealt with the racial percentages of certified and non-

certified staff and the second dealt with the recruitment of African

American teachers and staff:

> A.    1. Barring the imposition of state-mandated budget cuts, the Board shall ensure that the racial make-up of the certified teaching staff and the non-certified staff, respectively, at each and every school in the district are within 10% below and 20% above the district-wide average for schools serving the same grades (*e.g.*, elementary, middle, high);
>
> 2. Should state-mandated budget cuts be imposed, the Board shall use its best efforts to comply with the preceding paragraph. In the event that the percentage of African American or white certified or non-certified staff at any school falls outside the range prescribed in the preceding paragraph, the Board shall, within thirty (30) days of its personnel actions, notify the parties in writing. The Board's submission to the parties shall identify each such school in which the prescribed range has not been met, specifying (for each instance) the extent to which the Board has failed to meet the prescribed range, explaining the reasons for each such failure, and specifying each and every personnel decision (and the bases for such decision) that caused the school to fall outside the prescribed

range.  If, after reviewing the Board's submission and any reasonable clarifying information that may be requested pertaining to the above, any party believes that the Board has not complied in good faith or that its failure to meet the prescribed range at any school was avoidable, it may notify the Board and attempt to resolve such issue(s) and/or seek appropriate relief from the Court.

B.    The Board shall undertake the following efforts to recruit African American teachers: (1) continue to visit colleges and universities, including historically black institutions, to meet with prospective teachers; (2) continue to mail letters to prospective teachers and career counselors regarding vacancies; and (3) request career counselors to provide resumes of qualified African American teachers.

C.    Should any vacancies occur in the central office, the Board shall advertise vacancies for a period of at least 21 days and post vacancy announcements in the faculty lounges and main offices of all schools.

Compliance with the racial percentages was excepted during periods of proration, because in such situations the Board is required to cut staff (or not replace vacant staffing positions) in order to operate within budget. Such reductions in staff are governed by the Alabama Fair Dismissal Act and Alabama Tenure Law in that probationary staff and non-tenured teachers must be cut first without consideration of race or school location. Moreover, the reduction in staff caused by proration requires the system to transfer teachers and  staff to and from school locations without consider-

ation of race.  Unfortunately, the first year of the 2003 Consent Order, the Board was subject to state-mandated budget cuts (i.e. proration).  The Board made its best efforts during the 2003-2004 school year to achieve the required racial percentages despite the serious financial problems it was facing.  In its September 15, 2003, bi-annual report, the Board notified the Court and the parties that it was subject to state-wide proration and provided a written summary of why the Board was unable to accommodate the 10% below and 20% above ranges set forth in the 2003 Consent Order for some of the schools in its system.

During the 2004-2005 school year, the Board was not subject to state-mandated budget cuts and was in compliance with the racial percentages set forth in the 2003 Consent Order for both certified and non-certified staff.

With regard to the recruitment of African-American teachers, Sandra Graham, Director of Student Services at the Board, implemented an African-American Recruitment Plan which included each item required in the 2003 Consent Order.  Mrs. Graham visited primarily African- American colleges and universities in order to recruit more African-American teachers.  Mrs.

Graham mailed letters to career counselors at Stillman College, Tuskegee University, Miles College, Alabama State University, Alabama A&M University, Athens State University, Talladega College, University of North Alabama, University of Alabama Huntsville, Auburn University, University of Alabama Birmingham, Jacksonville State University, and University of North Alabama stating that the Board was specifically targeting recruitment of African-American teachers and asking these counselors to encourage African-American students to apply in the district.   The number and type of positions available were listed and the contact information for application was provided.  Moreover, Mrs. Graham sent numerous letters to prospective African-American teachers, enclosing an application for employment and asking them to apply with the district for a position.

Finally, the Board complied with the 2003 Consent Order with regard to the posting of vacancies in the central office.  All the Board's actions with regard to personnel assignment were documented in its bi-annual reports submitted to the Court and parties.

3.   Bi-Racial Advisory Committee

The Board's obligations regarding the Bi-Racial Advisory Committee (hereinafter the "Committee") were set forth in the 2003 Consent Order as follows:

A.   The Board shall re-establish an independent Bi-Racial Advisory Committee, to advise and make recommendations to the superintendent and school board regarding existing board policies and any additional policies and/or programs to advance desegregation and improve education in the system.  Within twenty (20) days of the entry of the order, the private plaintiffs shall appoint and submit to the parties the names of 3 citizens of Gadsden, and the defendants shall appoint and submit to the parties the names of 3 citizens of Gadsden who are not affiliated with the Gadsden City School District, to serve on the Committee.  The Committee shall at all times be composed of at least 3 members of each race.  The Board shall encourage the Committee to meet, pursuant to appropriate notice, at a reasonable time and place to be determined by the Committee, and the Board shall make available appropriate meeting facilities within the school district if requested by the Committee; and the Board shall encourage the Committee to maintain appropriate records and minutes of its meetings.   The Board shall supply the Committee with reasonable staff support and technical assistance, including assistance in typing, printing and distributing meeting minutes, and such reasonable information as the Committee may request, in writing, including but not limited to copies of the semi-annual reports provided by the Board to the Court and parties pursuant to this consent order.  The Board shall make available at its

central office copies of the Committee's meeting minutes. At least once a year, the Board shall designate a regularly scheduled public Board meeting, to which Committee members will be invited with at least thirty (30) days' notice, during which each Committee member shall be afforded the opportunity to address to advise and make recommendations regarding policies and/or programs to advance desegregation and improve education in the system.

In accordance with the 2003 Consent Order, the parties appointed their respective members to the Committee, and the Board encouraged the Committee to meet. The Committee met regularly, usually on a monthly basis. In order to provide the Committee with information at its meetings, the Board provided the Committee with any staff member it desired. The Board provided the Committee with a secretary who attended the meetings, recorded the Committee minutes, typed the minutes, and distributed them. The Committee was provided with a copy of the bi-annual reports filed by the Board. The Board also met annually with the Committee at a regularly-scheduled Board meeting. All Committee members were notified about

these annual meetings, in writing, more than thirty (30) days beforehand, and all Committee members were given ten minutes[3] each to speak.

The Board documented its compliance actions and included said documentation in its bi-annual reports to the Court and parties.  During the pendency of the 2003 Consent Order, no party lodged any complaint (using the procedure outlined in the 2003 Consent Order or otherwise) that the Board had not complied with its obligations with regard to the Committee.

4.    Student Assignment

The Board's obligations pursuant to the 2003 Consent Order with regard to student assignment were as follows:

A.    At the elementary school level, the Board shall assign students randomly (without regard to race) to classrooms.

B.    The Board shall strictly enforce attendance zone lines by requiring two forms of proof of residence for new students (an affidavit from the parent or guardian is insufficient); in the absence of two forms of proof, the parent or guardian of each new student must submit an affidavit as to residence and a photo identification, and must appear for an interview with Sandra Graham or any other qualified central office staff member designated by the Board.

---

[3]The provision regarding the Committee's period for public comments was amended by the Court in its August 4, 2003, Order.

The Board insured that all elementary students were assigned to classrooms randomly. Wynell Williams, Director of Elementary Education for the Board, certified this policy in the bi-annual reports. Moreover, the Board enforced the residency requirements at each school in the system. Each school used a Board-approved proof of residency form, and the principal of each school required a parent or guardian of each child attending that school to execute and deliver to the school a proof of residency form before the child was admitted to the school at the commencement of the year. Proof of residency was further documented by requiring three proofs of residency (i.e., deed, lease, rent receipt, utility receipt or other written instrument verifying residency). The principal was required to sign the proof of residency after it was properly executed and the documents were examined.

Any student whose parent or guardian was unable to satisfy the requirements was denied admission, until that parent and the custodian of the residence was interviewed and the interview was accompanied by a written explanation by the parent as to the reason the parent could not comply with the proof of residency. The custodian of the residence was

required to execute an affidavit satisfactorily confirming the information provided by the parent and verifying the residency of the student.

The Board documented its compliance actions and included said documentation in its bi-annual reports to the Court and parties.  During the pendency of the 2003 Consent Order, no party lodged any complaint (using the procedure outlined in the 2003 Consent Order or otherwise) that the Board had not complied with its obligations with regard to the student assignment.

Moreover, the Board notified and worked voluntarily with the United States with regard to alleged improper transfers being allowed by a school district adjacent to the Gadsden City School district. The Board became aware of allegations that an adjacent district was not complying with its school attendance zones and was allowing Gadsden students to enroll.  The Board became concerned that this practice would have a detrimental effect on its desegregation efforts and hinder its compliance efforts regarding the 2003 Consent Order.  The Board provided the United States with information regarding the at-issue students and requested the United States' assistance in enforcing student zone boundaries.  This action by the Board represents

an effort by the Board to go "above and beyond" its obligations under the 2003 Consent Order and is a clear example of the Board's good faith efforts to eliminate vestiges of segregation.

      5.    Quality of Education

With regard to quality of education, the 2003 Consent Order required as follows:

    A.    The Board shall ensure that students at Litchfield High School have equal access to the same courses that are offered at the other high schools by, at a minimum, providing at Litchfield every course provided by other schools at least once each year (assuming at least eight students sign up for the course) and ensuring that advanced placement/honors classes are separate and have distinct curricula from regular classes.

    B.    The Board shall approve and disseminate to all middle and high school students the following policy concerning independent study classes: If fewer than eight students sign-up for a course offered at Litchfield, a student may request, in writing, to be offered an independent study for an advanced placement/honors class with the Independent Study Application Form which shall be provided by the Board. The Independent Study Application Form must be submitted within seven days after the beginning of the semester in which the independent study is requested. The Litchfield principal shall review any Independent Study Application Form submitted and allow the student to enroll in the independent study provided that:

        1.    A certified teacher is available to teach the independent study;

2.  An advanced core level class is available; and

3.  The principal and the Superintendent, or his designee, approves the class as an independent study.

Factors which are to be considered in approving the independent study include coordination of the teacher's and student's regular class schedule with the independent study schedule, availability of teaching staff, and availability of classroom space.  Should more students sign up for an independent study than can be accommodated, students will be granted the independent study on a first come first serve basis.  Such independent study classes shall use state- and District-approved textbooks, along with a course syllabus, and shall provide a final grade for each student for the course.

C.  The Board shall ensure that guidance counselors at Cory Middle School and Litchfield High School inform eighth and ninth graders, respectively, of the District's policies related to independent study classes; the availability of AP and honors courses over the upcoming school years (*i.e.*, which courses will be offered during which semesters); and that teachers inform all students enrolled in AP classes about the availability and location of AP exams, and provide all students appropriate information and counseling about the AP exams.

D.  The Board shall post the Independent Study Program at Litchfield High School and Cory Middle School, mail to each parent or guardian, within ten (10) days of the end of each school year, a flyer describing the Independent Study Program, and include the Independent Study Program in the Litchfield student handbook, including a full description of the independent study policy set forth in paragraph B above.

The Board's policy and practice is to offer all courses each year at each high school in the system.  The Board's annual registration form is identical for each high school in the district.  Moreover, these forms have clearly delineated advanced and honors courses and these classes have distinct syllabi.  The Board agreed in the 2003 Consent Order to allow the class size for honors and advanced classes at the district's majority African-American high school, Litchfield High School, to be lowered to only eight (8) students.  Litchfield High School (hereinafter "LHS"), has a smaller student body than the district's other two high schools.  Therefore, the 2003 Consent Order attempted to allow the LHS students more access to honors and advanced classes that might be otherwise prohibited due to an inadequate number of students registering for such a class.

To further this intended purpose of encouraging LHS students to enroll in advanced and honor classes, the Board agreed in the 2003 Consent Order to initiate an Independent Study Policy specifically for LHS.  Therefore, should eight students fail to enroll for a specific honor or advanced class, an LHS student would have the opportunity to avail himself/herself to the Independent Study Policy in order to take that class on the LHS campus.

Prior to the implementation of the Independent Study Policy, an LHS student who sought to take a class that did not have enough students to enroll to support the class at LHS would travel to one of the other two high schools to take the class.

The LHS Independent Study Policy was provided to the LHS and Cory Middle School principals, posted at LHS and Cory Middle School and disseminated to all LHS and Cory students.   The Independent Study Policy was posted at LHS and Cory Middle School in accordance with the 2003 Consent Order.   Moreover, the policy was mailed to each LHS and Cory Middle School parent/ guardian within ten (10) days of the school year.

With regard to counseling as provided in the 2003 Consent Order, counselors at Cory Middle School and LHS informed 8th and 9th grade students regarding independent study, advanced, honors and AP classes during registration in spring semester.  Sandra Graham sent all 8th and 9th grade students a notice explaining the availability of advanced, honors, AP, and independent study courses.  She included in the notice a copy of the independent study policy and an independent study application form.  LHS students enrolled in AP classes have been notified about the availability and

location of AP exams.  All the Board's actions were documented in their bi-annual reports submitted to the Court and parties.

### 6. Facilities

The Board agreed to perform several upgrades and repairs to the facilities at LHS and Cory Middle School.  The Board completed all upgrades and repairs in accordance with the 2003 Consent Decree, including building a new weight room and athletic office complex and a new art facility at LHS.

The Board documented its compliance actions and included said documentation in its bi-annual reports to the Court and parties.  During the pendency of the 2003 Consent Order, no party lodged any complaint (using the procedure outlined in the 2003 Consent Order or otherwise) that the Board had not complied with its obligations with regard to the facilities.

### 7. Discipline Data

The 2003 Consent Order required the Board to continue to maintain discipline data, by race, for each school.  The Board complied with this provision.  No party complained at any time that the Board had not complied with this provision of the 2003 Consent Order.

### 8. Reports by Dr. Harold Bishop

The 2003 Consent Order required the Board to "fully implement the plans and recommendations set forth by Dr. Harold Bishop in his reports dated May 15, 1999 and June 2, 1998." The Board complied with Dr. Bishops' reports and notified the Court and parties of such compliance in its annual reports. No party complained at any time that the Board had not complied with this provision of the 2003 Consent Order.

9. Reporting

With regard to reporting, the 2003 Consent Decree required the Board to submit comprehensive reports on September 15 and February 15 of each year. These reports were extensive and included a detailed narrative summary and several volumes of attached supporting documentation. The Board has satisfactorily complied with this provision of the 2003 Consent Order.

10. Future Action

The Board understands that the declaration of unitary status does not relieve it of its responsibility to its faculty, its staff, its students, and the community which it serves. To this end, the Board plans to adopt a resolution committing to the continuation of the district's compliance with

the obligations necessary to maintain a unitary system of public education.

C.    August 24, 2005, Fairness Hearing

After the Board and its members filed their motions for declaration of unitary status and termination of this litigation, the Court required publication and notice of the proposed dismissal and scheduled a fairness hearing, and established procedures for filing comments and objections.

On August 24, 2005, the Court held a fairness hearing on the Board's motion for declaration of unitary status.  The Board presented evidence in support of its Petition.  The Board presented proof of publication of the notice of the fairness hearing from the Gadsden Times and The Reporter and a copy of the resolution referenced in paragraph B.10 above relating to its commitment to the continuation of its compliance obligations.  The Board also presented the affidavit testimony of Bob Russell, Superintendent; Ed Miller, Assistant Superintendent; Sandra Graham, Director of Student Services; David Asbury, Technology Coordinator; Johnnie Parker, Principal of Litchfield High School; Kimberly Smith, Principal of Cory Middle School; Peter Rowe, Principal of Gadsden High School; and Mary Anne Clayton, Principal of Emma Sansom High School.  The affiants were present at the hearing to

provide any party so desiring an opportunity to cross examine them.  The private plaintiffs called Bob Russell and Mary Anne Clayton for live testimony.  Six community members testified, expressing various concerns about the system and objections to unitary status.

D.    Advisory Committee

The parties have agreed to the formation of a voluntary advisory committee.  The Court wants to make clear that no aspect of this committee is subject to the Court's continuing jurisdiction or oversight.  The committee will establish its own internal procedure, operations and protocol and should receive its support from the community.  The initial structure agreed to by the parties is as follows: the committee will consist of nine (9) members who will serve three-year terms, with the initial term beginning on October 1, 2005.  For the first three-year term, five members of the committee will be appointed by the local NAACP chapter and four by the Board.  During the second three-year term, five members of the committee will be appointed by the Board and four by the local NAACP chapter.  Subsequent terms will alternate the five-to-four majority structure described above.

III.    CONCLUSION

On the basis of the record evidence, witness testimony, and averment of counsel, the Court finds that the Board and its members have met the standards entitling the school district to a declaration of unitary status and termination of this litigation.

The plaintiff parties have succeeded in the task they began decades ago to seek the end of the system of segregation in the Gadsden City School System.   The Board has complied with prior orders of this Court, has eliminated the vestiges of discrimination to the extent practicable, and has shown good faith through its commitment to this Court's decrees, its implementation of the 2003 Consent Order, and its adoption of a policy of future non-discriminatory actions.  Although the Court recognizes that it may no longer order the Board to adopt measures designed to bring about unitary status, the Court encourages the Board to consider continuing, on a voluntary basis, policies and practices that will help to sustain a strong academic curriculum and educational opportunity for all students in Gadsden's public schools and that will help to further develop a diverse student body, faculty, and administrative staff.

In making its ruling today, the Court recognizes and congratulates the sustained efforts of the parties.  In so doing, the Court notes, as the Eleventh Circuit stated in *Duval County School System*, that "[t]he Board, and the people of [Gadsden] who, in the end, govern their school system, must be aware that the door through which they leave the courthouse is not locked behind them. They will undoubtedly find that this is so if they fail to maintain the unitary system [the court] conclude[s] exists today."  273 F.3d. at 976-77.

Done this 26th day of August 2005.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE